# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### EASTERN DIVISION

**RAMON P. HANSBERRY SR.**                                                              **PLAINTIFF**

**v.**                                          **Case No. 2:16-cv-00158-KGB**

**ARKANSAS STATE HIGHWAY**
**AND TRANSPORTATION DEPARTMENT**                                      **DEFENDANT**

## OPINION AND ORDER

Before the Court is defendant Arkansas Department of Transportation's ("ARDOT")[1] motion for summary judgment (Dkt. No. 30). Plaintiff Ramon P. Hansberry, Sr., has responded in opposition, and ARDOT has replied (Dkt. Nos. 35, 40). For the reasons that follow, the Court grants ARDOT's motion for summary judgment and enters judgment in favor of ARDOT on Mr. Hansberry's race discrimination claim.

In his complaint, Mr. Hansberry brought claims against ARDOT under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, 42 U.S.C. § 1983, the Due Process Clause of the Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment (Dkt. No. 1).[2] On May 10, 2018, the Court granted ARDOT's partial motion to

---

[1] To clarify, Arkansas Department of Transportation was formerly referred to as Arkansas State Highway and Transportation Department ("AHTD"). The Court referred to ARDOT as AHTD in previous Orders.

[2] This Court previously dismissed Mr. Hansberry's 42 U.S.C. § 1983 claim (Dkt. No. 29). Despite this, Mr. Hansberry discusses law applicable to § 1983 claims in his response (Dkt. No. 37, at 12-14). Mr. Hansberry may bring suit against state actors directly under Title VII, as the Eighth Circuit Court of Appeals has held that Congress abrogated states' sovereign immunity for claims under Title VII. *See Lors v. Dean,* 746 F.3d 857, 860 n.4 (8th Cir. 2014) (citing *Nevada Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 729–30 (2003)). Even if Mr. Hansberry properly asserted an Equal Protection claim under § 1983 against this state defendant, his Title VII and § 1983 claims set forth "parallel, substantially identical, legal theories of recovery" to which this

dismiss and dismissed without prejudice Mr. Hansberry's claims, with the exception of his Title VII race discrimination claims relating to an alleged failure to promote in 2015 and his demotion in 2015 (Dkt. No. 29). ARDOT seeks summary judgment on Mr. Hansberry's remaining Title VII race discrimination claims (Dkt. No. 30).

## I.  Factual Background

Unless otherwise noted, the following facts are taken from Mr. Hansberry's response to ARDOT's statement of undisputed facts (Dkt. No. 36). Mr. Hansberry was employed by ARDOT when he filed his complaint but has since retired (*Id.*, ¶ 1). ARDOT is a state agency responsible for the construction, maintenance, repair, and safety of the Arkansas State Highway System, for coordinating public and private transportation activities, and for implementing a safe and efficient intermodal transportation system (*Id.*, ¶ 2).

ARDOT first hired Mr. Hansberry on June 1, 1989, as a General Laborer (*Id.*, ¶ 3). During his first ten years of employment, Mr. Hansberry held the positions of Single Axle Truck Driver, Backhoe/Front End Loader Operator, Lead Person, and Maintenance Aide II (*Id.*). On June 17, 1999, ARDOT promoted Mr. Hansberry to Crew Leader (St. Francis County) (*Id.*). Mr. Hansberry transferred to Crew Leader (Lee County) in April 2011 (*Id.*).

ARDOT has an Equal Employment Opportunity ("EEO") policy prohibiting discrimination against employees on the basis of a person's race and age, among other things (*Id.*, ¶ 4). Mr. Hansberry received a copy of that policy and signed an acknowledgement of receipt (*Id.*, ¶ 5). Mr. Hansberry also received and acknowledged receipt of the Personnel Manual and other

---

Court applies "the same analysis to each claim." *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692 n.3 (8th Cir. 2009) (quotations and citations omitted).

EEO policies (*Id.*, ¶ 6). At the time of the selection decision at issue in this case and prior to his demotion, Mr. Hansberry was employed as a Crew Leader (*Id.*, ¶ 7). Crew Leaders are responsible, under general supervision, for the various phases of crew work to facilitate the completion of specific assignments (*Id.*, ¶ 8).

The chain of command above Mr. Hansberry during the events at issue in this case included Area Maintenance Supervisor ("AMS"); then Assistant Maintenance Superintendent, referred to as District Maintenance Superintendent since June 2017; then District Maintenance Engineer for District 1; then District 1 Engineer Rex Vines; then Assistant Chief Engineer Operations Tony Sullivan; then Deputy Director and Chief Engineer Emanuel Banks; then Deputy Director and Chief Operating Officer Lorie Tudor; and then Director of ARDOT Scott Bennett (*Id.*, ¶ 9). The individuals holding the three positions directly above Mr. Hansberry during the summer of 2015 were new to those positions (*Id.*, ¶ 10). Tommy Halbert was promoted to Assistant Maintenance Superintendent on June 27, 2015, and Matt Emberton was promoted to District Maintenance Engineer on July 11, 2015 (*Id.*). Mr. Hansberry only seeks to recover for the AMS selection decision that occurred in July 2015 (*Id.*, ¶ 11).

### A.    2013 AMS Interview

Ray J. Woodruff, then District Engineer for District 1, and Mr. Vines, who held the position of District Maintenance Engineer at the time, interviewed Mr. Hansberry for AMS (St. Francis County) in January 2013 (*Id.*, ¶ 12). Mr. Hansberry, Robert Gray, Alfred Langhorn, and Anthony Burnett interviewed for the open AMS position (Dkt. No. 36, Ex. C). Mr. Woodruff wrote an interoffice memorandum to Crystal Woods, who served as Human Resources ("HR") Division Head, on January 24, 2013, concerning the reasoning for selecting Mr. Gray over the other candidates for the open AMS position (*Id.*).

In the memorandum, Mr. Woodruff states that "[d]uring the interview [Mr. Hansberry] was unable to demonstrate adequate ability to interpret and apply Departmental policies and procedures, Part 6 of the MUTCD nor the Maintenance Management Program. Not meeting the minimum requirements for the position, he was not selected for the position." (*Id.*, at 1). The memorandum states that Mr. Gray "demonstrated adequate familiarity with all phases of highway maintenance, and adequate ability to interpret and apply Departmental policies and procedures, Part 6 of the MUTCD and the Maintenance Management Program." (*Id.*). Mr. Woodruff wrote that Mr. Langhorn "does not have the educational equivalent to a diploma from an accredited high school . . . not meeting the minimum requirements for the position . . . ." (*Id.*, at 2). The memorandum describes Mr. Burnett as "unable to demonstrate adequate ability to interpret and apply Departmental policies and procedures, Part 6 of the MUTCD nor the Maintenance Management Program. Not meeting the minimum requirements for the position, he was not selected for the position." (*Id.*). According to Mr. Woodruff's affidavit, he "determined that Hansberry did not meet the minimum requirements for the position, and was not selected for the position." (Dkt. No. 30, Woodruff Aff., Ex. C, ¶ 4). Mr. Woodruff also stated that he "was the final decision maker on the January 2013 AMS selection." (*Id.*).

ARDOT has a grievance policy that allows employees to grieve employment actions with which they disagree which is summarized on the employee grievance form (Dkt. No. 36, ¶ 15). Following the selection of Mr. Gray, Mr. Hansberry filed a grievance alleging that he was not selected for the AMS Position because of his race and his age (*Id.*, ¶ 16). Joanna McFadden who is ARDOT's EEO/Disadvantaged Business Enterprise ("DBE") Section Head is African American (*Id.*, ¶ 17). Ms. McFadden wrote a letter in response to Mr. Hansberry's grievance (Dkt. No. 30, Ex. E1). In the letter, Ms. McFadden stated that she did a "thorough review . . . of discrimination

4

based on race in the recent selection of the Area Maintenance Supervisor – St. Francis County." (*Id.*). Ms. McFadden further stated that "[t]he review did not reveal that any discrimination action had taken place." (*Id.*). Ms. McFadden also advised Mr. Hansberry that he "may register the complaint with the Equal Employment Opportunity Commission." (*Id.*). Approximately two months before the selection decision that is the subject of this lawsuit, Mr. Hansberry applied for a different Lee County AMS position, Requisition 5111 (*Id.*, ¶ 20).

### B. May 2015 AMS Interview

According to Ms. Woods, who served as HR Division Head, Mr. Hansberry applied for the Lee County AMS position "approximately two months before the position that is at issue in this case." (Dkt. No. 30, Woods Aff., Ex. A, ¶ 24c). William Cheatham, District Maintenance Engineer for District 1, made the recommendation to hire Anthony Burnett, an African American male, for AMS, and Mr. Vines approved that recommendation (Dkt. No. 36, ¶ 23). According to Ms. Woods, Mr. Cheatham stated in his applicant notes for Mr. Hansberry that:

> Although Mr. Hansberry is the Crew Leader for Crew 1391 and the longest amount of service time, he performed the poorest out of the 3 candidates during the interview process. He was clearly not able to interpret and apply the procedures contained in part 6 of the MUTCD. He stated in the interview that his crew had not been referring to the MUTCD for traffic control operations which are performed on a daily basis and that the manual had been lost until a week ago.

(Dkt. No. 30, Woods Aff., Ex. A, ¶ 24c). Mr. Hansberry does not allege that the selection of Mr. Burnett was discriminatory (Dkt. No. 36, ¶ 24).

### C. July 2015 AMS Interview

Mr. Hansberry applied for an open AMS (Lee County) position (Requisition 6703) on June 25, 2015 (*Id.*, ¶ 25). Mr. Vines and Mr. Halbert conducted oral interviews of applicants including Mr. Hansberry on July 12 and 13, 2015 (*Id.*, ¶ 26). In the interviews, applicants were provided copies of the Manual on Uniform Traffic Control Devices ("MUTCD"), Personnel Manual, and

Maintenance Supervisors Manual and were advised that they should refer to those documents during the interview (*Id.*, ¶ 27). In his affidavit, Mr. Vines states that applicants for the AMS position "were encouraged (and expected) to refer to the supplied manuals and to read the correct answer from them." (Dkt. No. 30, Vines Aff., Ex. D, ¶ 4).[3] All applicants were orally asked the same pre-prepared questions in the interviews (*Id.*, ¶ 29). According to Mr. Vines' affidavit, he "recorded the applicants' responses to the questions by handwriting their responses below the question." (Dkt. No. 30, Vines Aff., Ex. D, ¶ 5). Mr. Vines "later typed their responses and [his] comments regarding those answers such as whether the applicant incorrectly answered the question or whether he referred to the appropriate manual in answering the questions." (*Id.*). Regarding Mr. Hansberry's interview, Mr. Vines states that "[t]he red comments show that Hansberry often did not refer to the proper manual and that many answers were wrong." (*Id.*).

As part of the interview, Mr. Vines asked all of the applicants four multipart questions on Part VI of the MUTCD (Dkt. No. 30, Vines Aff., Ex. D, ¶ 6). Part VI of the MUTCD covers the fundamental principles of temporary traffic control and gives minimum requirements, guidance, and suggested options to enhance and increase the safety of the traveling public traversing through a work zone in addition to the workers within the work zone (Dkt. No. 36, ¶ 35). If the information provided in the MUTCD is not properly interpreted and applied, the risk of personal injury or fatality to the traveling public and the workers is significantly increased (*Id.*). Although there are routine maintenance/construction operations, each work zone should be evaluated individually in

---

[3] Mr. Hansberry attempts to dispute this statement by denying it, with no cite to record evidentiary support for his denial (Dkt. No. 36, ¶ 28). Therefore, the Court finds that this fact is undisputed. *See* Fed. R. Civ. P. 56(e) ("If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

regard to the geometry of the roadway, the speed of traffic, and the surrounding terrain (*Id.*).  It is important that an AMS demonstrate the ability to interpret and apply the MUTCD Part VI to each individual daily activity and subsequent work zone in order to decrease the opportunities for someone to be injured or killed (*Id.*).  An improperly erected work zone increases the chance of injury or death (*Id.*).  In his affidavit, Mr. Vines asserts that "[o]ne of the minimum requirements was that the applicant demonstrate the ability to interpret and apply Part VI of the MUTCD."  (Dkt. No. 30, Vines Aff., Ex. D, ¶ 6).  Mr. Vines states that he "determined that Hansberry did not demonstrate this ability as the result of his answers to questions 2, 3, 4, and 5 in the interview," regarding Part VI of the MUTCD (*Id.*).

One of the minimum requirements was that the applicant demonstrate the ability to interpret and apply the Departmental Personnel Manual (*Id.*, ¶ 39).  In his affidavit, Mr. Vines states that "[k]nowledge regarding the Personnel Manual was tested in questions 12 through 25, but Hansberry missed many of these questions and often did not refer to the Personnel Manual in answering the questions."  (Dkt. No. 30, Vines Aff., Ex. D, ¶ 6).  Another minimum requirement was that the applicant demonstrate the ability to interpret and apply the Maintenance Supervisor Manual as was tested in interview questions 1 and 11 (Dkt. No. 36, ¶ 41).  In his affidavit, Mr. Vines states that he "determined and documented in the computer system that Hansberry was unable to demonstrate the ability to interpret and apply Part VI of the MUTCD and that he had an unfavorable interview."  (Dkt. No. 30, Vines Aff., Ex. D, ¶ 6).  With regard to Don Moore's interview, a Caucasian applicant for the position, Mr. Vines states that he "determined and documented in the computer system that Moore demonstrated that he met the minimum requirements for the position and had performed well as Crew Leader on the Lehi Crew and

recommended that Moore be selected and notated." (*Id.*, ¶ 13). Mr. Vines "recommended that Moore be selected" for the AMS position (*Id.*).

According to Mr. Moore's affidavit, his work history includes "supervisor at United Parcel Service for eight years, working as a foreman at a construction company for seven years, owning an insulation company and supervising two employees for four years, and working as an assistant manager at a grocery store for four years." (Dkt. No. 30, Moore Aff., Ex. J, ¶ 2). In his affidavit, Mr. Vines states that, "[w]hile Hansberry had held the position of Crew Leader longer than Moore, Hansberry's length of service did not cause him to be more qualified for the AMS position than Moore." (Dkt. No. 30, Vines Aff., Ex. D, ¶ 6).

At the time of the selection, Mr. Vines told Mr. Hansberry that Mr. Moore was selected for the position instead of him because Mr. Moore was more qualified (Dkt. No. 36, ¶ 46). At the time that Mr. Vines selected Mr. Moore for AMS, Mr. Vines was unaware of any racial comments or slurs that Mr. Moore had ever made (*Id.*, ¶ 47). Mr. Halbert and Mr. Emberton did not make the decision to recommend Mr. Moore, nor the decision not to recommend Mr. Hansberry, for the position (*Id.*, ¶ 48). Mr. Vines is the one who recommended Mr. Moore be selected (*Id.*). Mr. Vines' recommendation to select Mr. Moore was approved by Mr. Vines' superior, Assistant Chief Engineer Operations Mr. Sullivan at the Executive Level and by Alicia Hunt on behalf of HR (*Id.*, ¶ 49).

Mr. Moore was selected for the AMS and promoted to AMS effective July 25, 2015 (*Id.*, ¶ 50). Mr. Vines, who recommended Mr. Moore, as well as Mr. Sullivan and Ms. Hunt, who approved the recommendation, all stated in their affidavits that Mr. Hansberry "was not minimally qualified for the AMS position." (Dkt. No. 30, Ex. D, Vines Aff., ¶ 12; Ex. H, Sullivan Aff., ¶ 4; Ex. I, Hunt Aff., ¶ 3). All individuals who were involved in the decision to select Mr. Moore have

testified in their sworn affidavits that they took no action regarding Mr. Hansberry because of his race and acted in good faith at all times regarding Mr. Hansberry (Dkt. No. 36, ¶ 52). Two of the four candidates for AMS positions whom Mr. Vines recommended or of whose recommendation Mr. Vines approved since his promotion to District Engineer have been African American (*Id.*, ¶ 53). Mr. Vines recommended or approved the recommendation to select Mr. Burnett on May 16, 2015, and Robert Johnson on December 12, 2015 (*Id.*). Both are African American employees (*Id.*).

There was no ARDOT policy during the selection process in July 2015 that required an applicant to have a certain number of years of service in a position before being promoted to an AMS position (*Id.*, ¶ 54). Applicants must demonstrate that they meet the minimum qualifications of a position (*Id.*). The most qualified applicant is selected, and promotions are not granted based solely on tenure (*Id.*).

### D. Crew Meeting From July 27, 2018

On Monday, July 27, 2015, Mr. Moore, who received the position Mr. Hansberry had sought and was Mr. Hansberry's new supervisor, began his first day in the new position (*Id.*, ¶ 55). In his affidavit, Mr. Moore states that "[p]rior to meeting Ramon Hansberry . . . in person, [he] briefly spoke on the phone with him regarding keys for a department truck." (Dkt. No. 30, Moore Aff., Ex. J, ¶ 4). According to Mr. Moore, "[o]ther than that brief conversation, [he] had never met or heard anything about Hansberry prior to [his] selection as Area Maintenance Supervisor." (*Id.*). On his first day in his new position, Mr. Moore went to the Lee County Area Maintenance Headquarters for the crew meeting to meet the entire Lee County Area Maintenance Crew (*Id.*, ¶ 57). Mr. Moore first introduced himself (*Id.*, ¶ 58). Mr. Moore then asked each member of the crew to identify himself or herself and tell the group what the member did (*Id.*). When it was Mr.

Hansberry's turn to speak, Mr. Hansberry claims Mr. Moore said that he already knew of Mr. Hansberry (*Id.*, ¶ 59). Mr. Hansberry, who was Crew Leader of the assembled crew, admits that he then responded, "I guess that I am a murderer, and I cut throats and kill people at night" or "I guess I'm a murderer and a cutthroat that kill people at night." (*Id.*, ¶ 60). Mr. Hansberry says he made the statement because Mr. Moore "had denied [him] the opportunity to let [Mr. Moore] get to know [him]" and that he was offended by the denial and felt slighted by Mr. Moore's comment (*Id.*, ¶ 61). Mr. Hansberry also stated that he made the statement "in a joking manner . . . ." (Dkt. No. 30, Hansberry Depo., Ex. B, at 28).

According to Mr. Moore, "[r]ight after the crew meeting, [he] spoke to Hansberry privately." (Dkt. No. 30, Moore Aff., Ex. J, ¶ 8). In that meeting, Mr. Moore "told Hansberry that he could understand him being upset at not getting the position, but [he] needed to know that [he] could count on [Mr. Hansberry] to be [his] assistant." (*Id.*). Mr. Moore asserts that "Hansberry replied, 'I will do my job, just enough to get by, but I am not going to be much help to you.'" (*Id.*). Mr. Moore responded to Mr. Hansberry that he "needed to know if [he] could depend on [Mr. Hansberry] and asked Hansberry again whether [Mr. Moore] could depend on him." (*Id.*). According to Mr. Moore, Mr. Hansberry said, "Just look at my hours I have built up, that ought to tell you something. I have been here 27 years and they are promoting people that don't know what they are doing." (*Id.*). Mr. Moore asserts that he then left with Mr. Halbert and "informed Halbert about Hansberry's remarks in the crew meeting and in [his] one-on-one meeting afterward." (*Id.*, ¶ 9). In response, Mr. Halbert told Mr. Moore that "the remark needed to be documented and addressed." (*Id.*).

Mr. Halbert then notified Mr. Emberton and Mr. Vines about Mr. Hansberry's remarks (Dkt. No. 36, ¶ 72). According to Mr. Moore, he prepared a statement about the one-on-one

meeting with Mr. Hansberry "on July 27, 2015, that [he] sent in an email to Vines that set forth what occurred in the crew meeting and in [his] meeting alone with Hansberry." (Dkt. No. 30, Ex. J, ¶ 9). After he learned of Mr. Hansberry's statements, Mr. Vines directed Mr. Halbert to interview the crew members regarding what they heard Mr. Hansberry say in the crew meeting (Dkt. No. 36, ¶ 74). According to Mr. Halbert, he "talked to each crew member who was present in the meeting." (Dkt. No. 30, Halbert Aff., Ex. F, ¶ 6). Mr. Halbert also asserts that he "typed a statement describing what occurred on July 27, 2015, regarding Hansberry's comments and provided it to Vines." (*Id.*, ¶ 7).

Around three o'clock that afternoon of July 27, 2015, the crew members who stated they had heard Mr. Hansberry's statement in the crew meeting were brought in the office, given a piece of paper, and asked to write down what they had heard Mr. Hansberry say in the crew meeting (Dkt. No. 36, ¶ 76). Corey Cross wrote that Mr. Hansberry said something in a joking manner along the line of "I hunt people at night." (*Id.*, ¶ 79). Rickey Oxner stated that Mr. Hansberry said, "Slip thru the night and slit thoarats [sic]." (*Id.*, ¶ 80). Waymon Weeams, Sr. wrote that Mr. Hansberry stated, "I hunt and at night and cut thoat [sic]." (*Id.*, ¶ 81). Waverly Barnes, Jr. wrote, "I am a monder [sic] by night." (*Id.*, ¶ 83). According to Kelly Reddick, III, "[i]n a joking way, I believe it was said that someone said that he was a killer. But I know that he didn't mean to offend anybody, just a lil [sic] joke." (Dkt. No. 30, Ex. A24). Samuel Sisk, Benford Adell, and Greg Branscomb claimed that they did not hear what Mr. Hansberry said (Dkt. No. 36, ¶ 84).

After Mr. Hansberry returned to Lee County Area Maintenance headquarters, at some point, Mr. Emberton and Mr. Vines met with Mr. Hansberry to discuss the statements he made in the crew meeting that morning and his conversation with Mr. Moore after the crew meeting (*Id.*, ¶ 85). ARDOT maintains the meeting occurred that same day (*Id.*). According to Mr. Hansberry,

he met with Mr. Emberton and Mr. Vines on July 28, 2015, when he returned to headquarters after performing sign maintenance, where Mr. Hansberry injured his back (Dkt. No. 30, Hansberry Depo., Ex. B, at 31-32).

According to a summary created by Mr. Emberton, Mr. Hansberry admitted, "I said I was a murder [sic] and cut throat at night." (Dkt. No. 36, ¶ 86). According to Mr. Hansberry, he told Mr. Emberton and Mr. Vines that "the statement that [he] made in a joking manner and everybody in the room laughed, you know." (Dkt. No. 30, Hansberry Depo., Ex. B, at 33). In regard to the statement he made at the crew meeting, Mr. Hansberry said that he "didn't mean anything by that . . . [and] wasn't aware that it was a problem." (*Id.*).

Mr. Emberton and Mr. Vines also asked Mr. Hansberry about the allegation that Mr. Hansberry told Mr. Moore that he would not be much help to him, and Mr. Hansberry said that he never said that (Dkt. No. 36, ¶ 87). According to Mr. Emberton's summary, with regard to the conversation with Mr. Moore after the crew meeting, "Mr. Hansberry stated that Mr. Moore did ask if he could count on [Mr. Hansberry] and [Mr. Hansberry] did tell Mr. Moore to look at his time and the hours, but did not state he wouldn't be much help." (Dkt. No. 30, Ex. A19, at 1). According to Mr. Hansberry, when Mr. Emberton and Mr. Vines asked him if he made a statement to Mr. Moore that he would not be much help, Mr. Hansberry told them that he "never said that." (Dkt. No. 30, Hansberry Depo., Ex. B, at 33).

In the meeting, Mr. Vines advised Mr. Hansberry that, at best, he considered Mr. Hansberry's statements in the crew meeting as unprofessional and that, as a supervisor and Crew Leader, he was to conduct himself in a professional manner (Dkt. No. 36, ¶ 89). According to his summary of the meeting, Mr. Emberton told Mr. Hansberry that he, as the Crew Leader, set the example for the rest of the crew and that with a little more consideration of his working all of this

could have been avoided (*Id.*, ¶ 90). According to Mr. Hansberry, Mr. Emberton told him that "it might have been the way that [you] presented that answer." (Dkt. No. 30, Hansberry Depo., Ex. B, at 33).

Mr. Emberton prepared a statement setting forth a summary of the meeting with Mr. Hansberry and provided it to Mr. Vines (Dkt. No. 36, ¶ 91). Mr. Moore prepared and provided a statement to Mr. Vines describing a conversation on July 28, 2015, with Mr. Hansberry (*Id.*, ¶ 92). In the statement, Mr. Moore said that Mr. Hansberry stated that he never told Mr. Moore that he would not help him (*Id.*, ¶ 93). Mr. Moore's statement asserted that Mr. Moore then restated what he had heard Mr. Hansberry say in the conversation from the day before (*Id.*, ¶ 94). In the statement, Mr. Moore said that they discussed Mr. Hansberry saying that he was going above and beyond his job duties (*Id.*, ¶ 95). In the statement, Mr. Moore related that Mr. Hansberry said that he used to work on equipment and welding parts, and Mr. Moore said that is not going above and beyond; it is doing their job (*Id.*, ¶ 96). In the statement, Mr. Moore related that he said to Mr. Hansberry that the day before Mr. Hansberry stated that he had been there 27 years and had gone above and beyond, but he would not do it anymore, that he would not be much help to Mr. Moore (*Id.*, ¶ 97). Mr. Hansberry denies this (*Id.*). According to the statement, Mr. Moore and Mr. Hansberry agreed to disagree about what Mr. Hansberry had said the day before (*Id.*, ¶ 98).

According to Mr. Hansberry, directly after the crew meeting with the Lee County Area Maintenance Crew, he was sent to Wynne, Arkansas, to pick up Greg Branscomb who dropped off a vehicle to be repaired in Wynne (Dkt. No. 30, Hansberry Depo., Ex. B, at 29-30). When he returned, Mr. Hansberry "found out that Don Moore was going around the crew asking if . . . they heard the statement that [Mr. Hansberry] made." (*Id.*, at 30). Mr. Hansberry asserts that he asked Mr. Moore "if he was inquiring about the statement or something that" Mr. Hansberry said earlier

in the day (*Id.*, at 31).  According to Mr. Hansberry, Mr. Moore informed him that Mr. Halbert was asking the other employees about Mr. Hansberry's statement (*Id.*).  Mr. Hansberry denies that he told Mr. Moore that he "would not be much help to [Mr. Moore] . . . ."  (*Id.*, at 33).

On July 28, 2015, Mr. Hansberry injured his back at work and was off work from July 29, 2015, to August 17, 2015 (Dkt. No. 36, ¶ 99).  After completing the investigation, Mr. Vines sent copies of the following to HR and EEO for review and recommendations:  the summary of the meeting with Mr. Hansberry prepared by Mr. Emberton; the witness statements that had been collected from the crew members; the July 27, 2015, email statement from Mr. Moore; the July 28, 2015, statement from Mr. Moore; and the statement from Mr. Halbert (*Id.*, ¶ 100).  Mr. Vines discussed Mr. Hansberry's actions with Ms. Woods, HR Division Head, and Ms. McFadden, EEO/DBE Section Head, and they agreed that ARDOT should move to the next step in progressive discipline and demote Mr. Hansberry to a non-supervisory position (*Id.*, ¶ 101).  Mr. Moore, Mr. Halbert, and Mr. Emberton were not involved in the decision to demote Mr. Hansberry (*Id.*, ¶ 102).  Mr. Hansberry purports to dispute this (*Id.*).[4]

Following the investigation, Mr. Vines prepared a memorandum to his supervisor, Mr. Sullivan (*Id.*, ¶ 103).  In this memorandum, Mr. Vines states that Mr. Hansberry had demonstrated an unwillingness to conduct himself with a harmonious and productive attitude toward his supervisor (*Id.*, ¶ 104).  Mr. Vines states in the memorandum that he found that Mr. Hansberry's statements could be seen as derogatory remarks toward the Department and his supervisor and

---

[4]  Mr. Hansberry attempts to dispute this statement by denying it, with no cite to record evidentiary support for his denial (Dkt. No. 36, ¶ 102).  Therefore, the Court finds that this fact is undisputed.  *See* Fed. R. Civ. P. 56(e) ("If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

could be seen as threating, intimidating and creating reasonable fear of injury to another person or subjecting another individual to emotional distress (*Id.*). Mr. Vines states that he found that Mr. Hansberry's comments at a minimum demonstrated his inability to provide leadership which was a requirement of his position (*Id.*). Mr. Hansberry purports to dispute this (*Id.*).[5]

Mr. Vines also noted in the memorandum that Mr. Hansberry had been given a written warning for multiple occasions of unauthorized usage of an ARDOT vehicle and recommended that Mr. Hansberry be demoted to a non-supervisory position (*Id.*, ¶ 105). Viewing Mr. Hansberry's actions as a whole, Mr. Vines found that Mr. Hansberry demonstrated an unwillingness to conduct himself with a harmonious and productive attitude toward his supervisor (*Id.*, ¶ 106). Mr. Vines believed that Mr. Hansberry's statements could be seen as derogatory remarks toward the Department and his supervisor and could be seen as threating, intimidating and creating reasonable fear of injury to another person or subjecting another individual to emotional distress (*Id.*, ¶ 107). Mr. Vines believed that the fact that Mr. Hansberry made the comments about being a murderer who cuts throats and kills people at night in front of the crew he supervised on Mr. Moore's first day in his new position, a position Mr. Hansberry applied for and did not receive, made the situation even more egregious (*Id.*, ¶ 108). Mr. Vines believed that Mr. Hansberry's comments at a minimum demonstrated his inability to provide leadership which was a requirement of his position (*Id.*, ¶ 109). Mr. Vines believed that the comments in the meeting with Mr. Moore

---

[5] Mr. Hansberry attempts to dispute this statement by denying it through a narrative objection, with no cite to record evidentiary support for his denial of what Mr. Vines' memorandum states (Dkt. No. 36, ¶ 104). Therefore, the Court finds that this fact to the extent it represents what Mr. Vines' memorandum states is undisputed. *See* Fed. R. Civ. P. 56(e) ("If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

right after the crew meeting further demonstrated Mr. Hansberry's unwillingness to work with his new supervisor with a productive and harmonious attitude and could be seen as derogatory toward his supervisor and the Department (*Id.*, ¶ 110). These facts, coupled with the fact that Mr. Hansberry had previously received a written warning, led Mr. Vines to believe that demotion and transfer was the appropriate discipline (*Id.*, ¶ 111). Mr. Hansberry disputes this (*Id.*, ¶¶ 106-111).[6]

With the memorandum, Mr. Vines also sent to Mr. Sullivan the witness statements of the crew, Mr. Halbert's statement, Mr. Moore's statement dated July 28, 2015, and Mr. Emberton's summary (*Id.*, ¶ 112). The memorandum, those supporting documents, and the Personnel Authorization Form 19-125, were sent up the chain of command (*Id.*, ¶ 113). Ms. Hunt signed off on behalf of HR, and Ms. McFadden signed off on behalf of EEO (*Id.*, ¶ 114). Assistant Chief Mr. Sullivan, Deputy Director and Chief Engineer Mr. Banks, and Deputy Director and Chief Operating Officer Ms. Tudor received Mr. Vines' recommendation and approved it (*Id.*, ¶ 115). ARDOT Director Mr. Bennett made the final decision to demote Mr. Hansberry, step three of progressive discipline, from Crew Leader to Maintenance Aide II effective August 22, 2015 (*Id.*, ¶ 116).

All individuals who were involved in Mr. Hansberry's demotion have testified that they took no action regarding Mr. Hansberry because of his race (*Id.*, ¶ 120). Mr. Reddick, Mr. Hansberry's replacement when he was demoted, was African American (*Id.*, ¶ 121). Mr. Hansberry admits that he said, "I guess that I am a murderer, and I cut throats and kill people at

---

[6] Mr. Hansberry attempts to dispute this statement by denying it through narrative objections, with no cite to record evidentiary support for his denial of what Mr. Vines' memorandum states (Dkt. No. 36, ¶¶ 105-111). Therefore, the Court finds that these facts to the extent they represent what Mr. Vines' memorandum states are undisputed. *See* Fed. R. Civ. P. 56(e) ("If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

night" in a crew meeting full of his subordinates on the day that Mr. Moore began his new position (*Id.*, ¶ 122). At 2:28 p.m. on July 27, 2018, Mr. Moore sent an email to Mr. Vines detailing the morning crew meeting and one-on-one meeting with Mr. Hansberry (Dkt. No. 30, Ex. J1). According to the email, Mr. Hansberry said to Mr. Moore in the one-on-one meeting, "I will do my job, just enough to get by, but I am not going to be much help to you." (*Id.*). ARDOT conducted an investigation into Mr. Hansberry's conduct, collected statements from witnesses, met with Mr. Hansberry regarding the allegations, and prepared a memorandum justifying the demotion decision (Dkt. No. 36, ¶ 124). Mr. Hansberry admits he made the statement about being a murderer but contends it was said in jest; he denies making the statement to Mr. Moore attributed to Mr. Hansberry in the one-on-one meeting (*Id.*, ¶¶ 123-124).

### E. Demotion Meeting

After Mr. Hansberry returned from his Family and Medical Leave Act ("FMLA") leave, Mr. Emberton, Mr. Halbert, and Mr. Moore met with him on August 20, 2015 (*Id.*, ¶ 145). Mr. Emberton presented Mr. Hansberry with the disciplinary action and told him that he had been demoted and transferred to Monroe County Crew in a non-supervisory position (*Id.*, ¶ 146). Mr. Emberton read the Documentation of Performance Requiring Improvement and asked Mr. Hansberry whether he had any comments (*Id.*). Mr. Hansberry wrote his comments on the Documentation (*Id.*). During this meeting, Mr. Hansberry claimed that Mr. Vines previously made inappropriate comments during the AMS interview in July 2015 (*Id.*, ¶ 147). Mr. Emberton stated that he would look into the alleged comments and forwarded those allegations for review by EEO and HR (*Id.*, ¶ 148). Mr. Vines and Mr. Halbert, who was present during the AMS interview, denied Mr. Hansberry's claim that Mr. Vines made the comments (*Id.*, ¶ 149). After an investigation, no evidence was found to substantiate that allegation (*Id.*, ¶ 150).

On November 27, 2013, Hansberry received a written counseling, step two of progressive discipline, for use of a department vehicle for unauthorized activities, e.g., going to the grocery store, convenience store, USPS, feed store, and home (*Id.*, ¶ 151). On February 1, 2016, Mr. Hansberry received a written counseling when his supervisor, Curtis Burnett, found that he left the job site without advising the supervisor of his need to leave and without receiving permission to leave (*Id.*, ¶ 153). Mr. Hansberry does not claim discrimination with regard to this disciplinary action by this African American AMS (*Id.*, ¶ 154).

On August 26, 2015, Mr. Hansberry filed a grievance with ARDOT regarding his demotion (*Id.*, ¶ 155). The grievance process went through the first two steps and was at the third step when Mr. Hansberry filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") on September 11, 2015 (*Id.*, ¶ 156). The Charge alleged that Mr. Hansberry was passed over for promotion in July 2015 and demoted in August 2015 because of his race and age (*Id.*, ¶ 157). Once Mr. Hansberry filed the Charge with the EEOC, the internal grievance process ended pursuant to ARDOT policy (*Id.*, ¶ 158). The EEOC issued a Notice of Right to Sue on August 31, 2016 (*Id.*, ¶ 159). Effective June 8, 2017, Mr. Hansberry voluntarily retired without notice because of physical problems (*Id.*, ¶ 160). In 2017, Mr. Hansberry worked only approximately 11 work days total prior to his retirement (*Id.*, ¶ 161). In his deposition, Mr. Hansberry stated that "I don't think my health will let me" return to work at the department (Dkt. No. 30, Hansberry Depo., Ex. B, at 69-70). Mr. Hansberry's retirement was unrelated to alleged race discrimination, the failure to promote him, or the demotion (*Id.*, ¶ 163).

## F.   Other Employees

On August 2, 2011, Mr. Fleming was disciplined for his conduct in using a state vehicle for personal use and other inappropriate conduct, and ARDOT issued a Documentation of

Performance Requiring Improvement to Mr. Fleming, placed him on leave without pay for two weeks, and required him to reimburse ARDOT for personal calls within the last 12 months (*Id.*, ¶ 126).[7]  Mr. Woodruff made the recommendation of discipline for Larry Fleming and the final decision about the discipline (*Id.*, ¶ 127).  According to Ms. Woods' affidavit, "[w]hile Vines' signature appears on the Documentation of Performance Requiring Improvement as the Counseling Supervisor, Vines was not involved in the investigation into the allegations against Fleming and was not involved in the disciplinary decision."  (Dkt. No. 30, Woods Aff., Ex. A, ¶ 24(i)).  Ms. Woods also stated that "Vines' signature only appears on the Documentation Improvement because he was Fleming's direct supervisor and counseled him about the incidents after the disciplinary decision had been made by Woodruff."  (*Id.*).  Mr. Woodruff was not involved in the disciplinary decision regarding Mr. Hansberry as Mr. Woodruff no longer worked at ARDOT when Mr. Hansberry was demoted (Dkt. No. 36, ¶ 129).

On December 9, 2015, Mr. Vines issued a written counseling to Mr. Moore for calling Samuel Sisk by the name of "Sambo."  (*Id.*, ¶ 131).  Mr. Moore had heard other employees, including African American employees, call Mr. Sisk "Sambo" to his face (*Id.*, ¶ 134).  Mr. Moore remarked in his disciplinary documentation, "I had heard other crew members call him that and it just stuck in my mind as a nickname.  I said it as a greeting and did not mean anything by it."  (*Id.*, ¶ 135).  Mr. Moore also stated that "I apologized to Sam and told him I did not mean to offend him.  I will be more cautious in the future of using nicknames to address employees."  (*Id.*).  In his

---

[7]  Mr. Hansberry attempts to dispute this statement by denying it through a narrative objection, with no cite to record evidentiary support for his objection to defendants' description of the conduct in which Mr. Fleming engaged or the discipline Mr. Fleming received (Dkt. No. 36, ¶ 126).  Therefore, the Court finds that this fact is undisputed.  *See* Fed. R. Civ. P. 56(e) ("If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

affidavit, Mr. Vines stated regarding the racial slur used by Mr. Moore that he "did not find that Mr. Moore intended the name as a racial slur and in fact do not believe that Moore intended the name as a racial slur." (Dkt. No. 30, Vines Aff., Ex. D, ¶ 42).

On January 27, 2016, Mr. Moore self-reported to his supervisor that he had referred to an employee as "boy." (Dkt. No. 36, ¶ 136).[8] According to the Documentation of Performance Requiring Improvement regarding this event, "[o]n that same date, the employee contacted EEO to express concerns that [Mr. Moore] had referred to him as 'boy'." (Dkt. No. 36, Ex. L). In his affidavit, Mr. Moore states that "[w]ith regard to the 'boy' comment, I did not intend the word to be a racial slur or to have any racial connotations." (Dkt. No. 30, Moore Aff., Ex. J, ¶ 17). On March 8, 2016, Mr. Vines placed Mr. Moore on five days leave without pay for using a word that had the potential of being viewed as a racial slur (Dkt. No. 36, ¶ 137). According to his affidavit, with regard to this event, Mr. Vines "did not find that Moore intended the name as a racial slur and in fact do not believe that Moore intended the name as a racial slur." (Dkt. No. 30, Vines Aff., Ex. D, ¶ 43).

On August 26, 2015, Mr. Gray was issued a Documentation of Performance Requiring Improvement for dictating assignment based on memory or convenience that could be interpreted as discriminatory and lead to a potential hostile work environment (Dkt. No. 36, Ex. M). Under the section for negative consequences, the form states that "[c]ontinued disregard for Department

---

[8] Mr. Hansberry attempts to dispute this statement by denying it with a narrative objection, with no cite to record evidentiary support for his objection to defendants' description of Mr. Moore self-reporting the incident (Dkt. No. 36, ¶ 136). Therefore, the Court finds that this fact is undisputed. *See* Fed. R. Civ. P. 56(e) ("If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

policy and procedure will result in further disciplinary action, up to and including termination." (*Id.*).

The Documentation of Performance Requiring Improvement Form that is created for disciplinary actions for a written warning or for a disciplinary leave of absence requires only the signature of the counseling supervisor and the reviewing supervisor and may be issued without approval by the Assistant Chief and/or Deputy Director (Dkt. No. 36, ¶ 140). The Director of ARDOT also does not make the final decision for written warnings or disciplinary leaves of absence (*Id.*). HR reviews written warnings after they are issued (*Id.*, ¶ 141). When a leave without pay disciplinary action occurs, the process is similar to the written warning process except that HR and EEO review the decision before the leave occurs (*Id.*).[9] When an employee is recommended for demotion for disciplinary reasons, the demotion recommendation requires the approval of HR, EEO, the appropriate Assistant Chief, both Deputy Directors, and the Director of ARDOT (*Id.*, ¶ 142). The Director of ARDOT makes the final decision whether to demote the employee (*Id.*). Because Mr. Moore received a written warning and leave without pay, the Documentation of Performance Requiring Improvement Form required only the signature of the Counseling Supervisor and the Reviewing Supervisor and review/approval from HR and EEO (*Id.*, ¶ 143). Mr. Vines, the Reviewing Supervisor, made the disciplinary decisions relating to Mr.

---

[9] Mr. Hansberry attempts to dispute this statement by denying it, with no cite to record evidentiary support for his denial (Dkt. No. 36, ¶ 141). Therefore, the Court finds that this fact is undisputed. *See* Fed. R. Civ. P. 56(e) ("If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

Moore, and his supervisors did not have to approve that decision (*Id.*).  Mr. Vines could not make the final decision to demote Mr. Hansberry (*Id.*, ¶ 144).[10]

## II.     Standard Of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Hollway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), cert. denied, 522 U.S. 1048 (1998).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial

---

[10] Mr. Hansberry attempts to dispute this statement by denying it with a narrative objection, with no cite to record evidentiary support for his denial (Dkt. No. 36, ¶ 144).  Therefore, the Court finds that this fact is undisputed.  *See* Fed. R. Civ. P. 56(e) ("If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co.*, 121 F.3d at 366. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). Accordingly, this Court applies the same summary judgment standard to discrimination cases as it does to all others.

### III.    Race Discrimination Claims

Mr. Hansberry brings a claim of race discrimination in violation of Title VII. Specifically, Mr. Hansberry asserts that ARDOT failed to promote him in July 2015 to the open AMS position because of his race and that he was demoted in August 2015 because of his race. Mr. Hansberry can establish a *prima facie* case of discrimination either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination under the three-step analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 953 (8th Cir. 2012). Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Torgerson,* 643 F.3d at 1043-44 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). Therefore, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. *Id.* A plaintiff with strong direct evidence that illegal

discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, irrespective of whether his strong evidence is circumstantial. *Id.* However, "if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id.* (quoting *Griffith*, 387 F.3d at 736).

## A.    Direct Evidence Analysis

"To be entitled to direct evidence analysis, the plaintiff must present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998) (internal quotation marks omitted). Mr. Hansberry presents no direct evidence of discrimination in support of any of his claims. Accordingly, the Court will proceed through the *McDonnell Douglas* analysis.

## B.    *McDonnell Douglas* Analysis

Under the *McDonnell Douglas* analysis, "the plaintiff bears the burden of establishing a *prima facie* case of discrimination." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007). If a plaintiff makes out a *prima facie* case, he creates a presumption of unlawful discrimination, and the burden shifts to the defendant to come forward with evidence of a legitimate nondiscriminatory reason for its actions. *Id.* If the defendant articulates such a reason, the burden returns to the plaintiff to show the defendant's proffered reason is pretextual and that unlawful discrimination was the true reason for the adverse employment action. *Tyler v. Univ. of*

*Ark. Bd. of Trustees*, 628 F.3d 980, 990 (8th Cir. 2011).  Pretext may be demonstrated by different means.  *See, e.g., Roxas v. Presentation College*, 90 F.3d 310, 316 (8th Cir. 1996).

Mr. Hansberry alleges race discrimination based on the ARDOT's alleged failure to promote him and his demotion.  The Court examines each of these claims by applying the *McDonnell Douglas* analysis.

### 1.	Failure To Promote Claim

Specific to Mr. Hansberry's failure to promote claim, to establish a *prima facie* case of race discrimination when alleging a failure-to-promote claim, Mr. Hansberry must show that:  (1) he is a member of a protected group; (2) he was qualified and applied for a promotion to an available position; (3) he was rejected; and (4) similarly situated employees, not part of his protected group, were promoted instead.  *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1086 (8th Cir. 2011). Mr. Hansberry has satisfied the first and third prongs of his *prima facie* case.  He is a member of a protected group and was rejected for the AMS position at issue in this case – the July 2015 AMS position.  The fourth prong is also satisfied because Mr. Moore, an employee who satisfies the similarly situated analysis for the *prima facie* case and is not part of Mr. Hansberry's protected group, was hired for the July 2015 AMS position.

ARDOT argues that Mr. Hansberry cannot make a *prima facie* case of failure to promote because Mr. Vines, who made the hiring decision for the July 2015 AMS position, determined that Mr. Hansberry was not minimally qualified for the position based on his interview.  Mr. Hansberry argues that he met the minimum qualifications for the AMS position and worked at ARDOT for a longer period, making him more qualified than Mr. Moore.  The threshold of proof necessary to make a *prima facie* case is minimal.  *See Johnson v. Arkansas State Police*, 10 F.3d 547, 551 (8th Cir. 1993).

The hiring process for the July 2015 AMS position included an interview process where all applicants were asked the same series of questions. For many of the interview questions, the applicants were asked to refer back to the MUTCD or Personnel Manual (Dkt. No. 36, ¶ 27). In the classification specifications for the AMS position, the minimum requirements included "[a]bility to Interpret and apply the procedures contained in the Maintenance Supervisor's Manual and part 6 of the Manual on uniform Traffic Control Devices." (Dkt. No. 36, Ex. F). The hiring process for AMS was objective including a list of requirements to apply for the position and standard pre-prepared interview questions that were asked to all applicants (Dkt. No. 36, ¶ 29).

There are work-related reasons why these questions were asked as a part of the interview. Part VI of the MUTCD covers the fundamental principles of temporary traffic control and gives minimum requirements, guidance, and suggested options to enhance and increase the safety of the traveling public traversing through a work zone in addition to the workers within the work zone (*Id.*, ¶ 35). It is important that an AMS demonstrate the ability to interpret and apply the MUTCD Part VI to each individual daily activity and subsequent work zone in order to decrease the opportunities for someone to be injured or killed (*Id.*). An improperly erected work zone increases the chance of injury or death (*Id.*). Further, one of the minimum requirements was that the applicant demonstrate the ability to interpret and apply the Departmental Personnel Manual (*Id.*, ¶ 39). Another minimum requirement was that the applicant demonstrate the ability to interpret and apply the Maintenance Supervisor Manual as was tested in interview questions 1 and 11 (*Id.*, ¶ 41).

In an effort to defeat summary judgment, Mr. Hansberry argues that Mr. Vines and Mr. Halbert, but especially Mr. Vines, did not write down the answers or write down correctly the answers that Mr. Hansberry gave during the interview. Specifically, Mr. Hansberry submits an

affidavit in which he contends in pertinent part regarding the interview for the July 2015 AMS position:

> 13.    I was interviewed by Rex Vines and Tommy Halbert, both Caucasian males.
>
> . . .
>
> 16.    I was asked several questions by Vines and Halbert, and they purportedly wrote down my responses to the questions asked.
>
> . . .
>
> 19.    During the course of discovery in this litigation, the defendant did provide my attorney with a copy of the responses to questions for the July 2015 interview.
>
> 20.    For the first time, I was able to review the responses written by Vines and Halbert on August 21, 2018.
>
> 21.    In looking at the responses written by Vines and Halbert, I can clearly see that they did not write down my complete answers that I gave, and there were several instances where I saw responses that I did not give.
>
> 22.    It is apparent to me that Vines and Halbert, particularly Vines, did not want me to have the position, due to their purposely distorting my answers that I gave during the interview process.

(Dkt. No. 36-2, Ex. D). However, Mr. Hansberry does not identify in his affidavit or elsewhere in the record evidence how the answers Mr. Vines or Mr. Halbert wrote down were incorrect or how Mr. Vines or Mr. Halbert purportedly purposely distorted his answers. For example, it is not clear on the record evidence whether Mr. Hansberry contends the alleged incorrect written answers were incorrect by being one word off or were incorrect by being materially different from the answer Mr. Hansberry contends he gave. Mr. Hansberry also does not identify the questions he believes he answered correctly, based on the answers he recalls giving. In this way, the Court determines that he fails to meet proof with proof at the summary judgment stage. When the Court reviews all record evidence and draws all reasonable inferences from that record evidence in favor of Mr.

Hansberry, Mr. Hansberry fails to demonstrate that he was minimally qualified for the July 2015 AMS position.

This decision that Mr. Hansberry fails to meet proof with proof is only strengthened when the Court turns to examine other record evidence. Mr. Hansberry purports to deny that he was found not minimally qualified twice before for this position based on the same type of interview process – once in 2013 (the "2013 interview process") and once approximately two months before the 2015 selection decision that is the subject of this lawsuit (the "prior 2015 interview process") (Dkt. No. 36, ¶¶ 13, 20-21). Mr. Hansberry cites no record evidence that calls into question the answers written in response to these interview questions; he claims not to have received a copy of documents generated from the 2013 interview process and fails to address at all the prior 2015 interview process in his most recently submitted affidavit (Dkt. No. 36-2, Ex. D, ¶¶ 10-11). He does not dispute that, along with Mr. Vines, Mr. Woodruff was involved during the 2013 interview process nor does he dispute that only Mr. Cheatham, not Mr. Vines, Mr. Woodruff, nor Mr. Halbert, participated in the prior 2015 interview process (Dkt. No. 36, ¶¶ 13, 21-22). Mr. Hansberry cites no record evidence to dispute that Mr. Cheatham found Mr. Hansberry not minimally qualified for the AMS position during the prior 2015 interview process (*Id.*, ¶ 22). Mr. Hansberry does not dispute that Mr. Cheatham recommended Mr. Burnett, an African American male, for the open position filled by the prior 2015 interview process (*Id.*, ¶ 23). Based on the undisputed record evidence, Joe Dewitt has no personal knowledge of Mr. Hansberry's performance after Mr. Dewitt's retirement in October 2012, which was approximately three years before Mr. Hansberry was considered for the July 2015 AMS position, nor does Mr. Dewitt have personal knowledge regarding Mr. Moore's qualifications for the July 2015 AMS position (Dkt. No. 37-2, Dewitt Aff., Ex. D, ¶ 1).

Viewing all record evidence in the light most favorable to Mr. Hansberry as the Court is required to do, the record evidence does not establish a genuine issue of material fact on whether Mr. Hansberry answered correctly the questions necessary to be considered minimally qualified for the July 2015 AMS position.  For these reasons, Mr. Hansberry has failed to show that he was minimally qualified for the July 2015 AMS position.  The Court finds that Mr. Hansberry has failed to make a *prima facie* claim for failure to promote.

Even if Mr. Hansberry had established a *prima facie* case of failure to promote, ARDOT met its burden of articulating a legitimate, nondiscriminatory reason for its failure to promote Mr. Hansberry.  Specifically, ARDOT contends that Mr. Moore, who was hired for the July 2015 AMS position over Mr. Hansberry, was more qualified than Mr. Hansberry (Dkt. No. 30, Vines Aff., Ex. D, ¶¶ 6, 13).  It is undisputed that Mr. Vines told Mr. Hansberry this at the time of the selection (Dkt. No. 36, ¶ 46).  ARDOT has presented the written interview notes from the relevant AMS interview process for both Mr. Hansberry and Mr. Moore (Dkt. No. 30, Vines Aff., Ex. D, ¶ 5). The interview notes show that Mr. Moore correctly answered more questions than Mr. Hansberry, especially with regard to questions where the applicants were expected to refer to one of the handbooks (*Id.*, ¶¶ 5-6, 11-14).  Compared to Mr. Moore, the written interview notes show that Mr. Hansberry did not correctly answer many questions and did not refer to the relevant handbook provisions (*Id.*).  Therefore, ARDOT has met its burden of articulating a legitimate, nondiscriminatory reason for not hiring Mr. Hansberry for the open AMS position.  The Court acknowledges that Mr. Hansberry disputes this, but the burden of articulating a legitimate, nondiscriminatory reason is low, *Wilking v. County of Ramsey*, 153 F.3d 869, 872-73 (8th Cir. 1998) (determining the Court's "inquiry is limited to whether the employer gave an honest

explanation of its behavior"), and the Court addresses issues raised by Mr. Hansberry in its analysis of alleged pretext.

Because ARDOT has articulated a legitimate, nondiscriminatory reason, the burden now shifts to Mr. Hansberry to prove ARDOT's failure to promote him was pretextual. "[T]o support a finding of pretext, [Mr. Hansberry] must show that [ARDOT] hired a *less* qualified applicant." *Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004) (emphasis in original). "Although [an employee] does possess the experience and some of the other qualities essential for success in the position, this does not suffice to raise an inference that [an employer's] stated rationale for giving the position to another is pretextual." *Lidge-Myrtil v. Deere & Co.*, 49 F.3d 1308, 1311 (8th Cir. 1995). "[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995).

The hiring process for the July 2015 AMS position included an interview process where all applicants were asked the same series of questions. The parties agree that, for many of the interview questions, the applicants were asked to refer back to the MUTCD or Personnel Manual (Dkt. No. 36, ¶ 27). In the classification specifications for the AMS position, the minimum requirements included "[a]bility to Interpret and apply the procedures contained in the Maintenance Supervisor's Manual and part 6 of the Manual on uniform Traffic Control Devices." (Dkt. No. 36, Ex. F). The hiring process for AMS was objective including a list of requirements to apply for the position and standard interview questions that were asked of all applicants (Dkt. No. 36, ¶ 29).

Mr. Hansberry asserts that Mr. Vines did not correctly write down the answers he gave during the interview. However, as explained, Mr. Hansberry does not state what answers Mr. Vines wrote down incorrectly, and Mr. Hansberry does not argue that he actually gave correct answers to any specific questions during the interview. Viewing Mr. Hansberry's affidavit on this point and the record evidence as a whole in the light most favorable to Mr. Hansberry, the record evidence does not establish a genuine issue of material fact on whether Mr. Hansberry answered correctly as many or more questions than Mr. Moore did during the interview or whether Mr. Hansberry was more qualified than Mr. Moore for the July 2015 AMS position. Mr. Hansberry fails to meet proof with proof, even when his affidavit is considered. Further, Mr. Hansberry fails to show through record evidence that his answers were incorrectly written down to discriminate against him on the basis of race.

The employer, not the Court or employees, decide what qualifications constitute the best qualified applicant. *See Cox v. First Nat'l Bank*, 792 F.3d 936, 939 (8thCir. 2015); *Krenik v. County of LeSueur*, 47 F.3d 953, 960 (8th Cir. 1995). Mr. Hansberry argues that he worked at ARDOT for 26 years and was a Crew Leader for 16 years. As a Crew Leader, Mr. Hansberry asserts that he regularly covered the position of AMS, when his boss was on vacation or took medical leave (Dkt. No. 36, ¶ 13 (setting forth in Mr. Hansberry's denial his purported qualifications)). ARDOT argues that Mr. Hansberry's years of experience working for ARDOT do not make him the most qualified candidate. According to Ms. Woods, who approved the hiring of Mr. Moore, promotions at ARDOT are not granted based solely on tenure, and the parties do not dispute this (Dkt. No. 36, ¶ 54). All parties agree that there was no ARDOT policy during selection for the July 2015 AMS position that required an applicant to have a certain number of years of service in a position before being promoted to an AMS position; instead, all parties agree

that applicants must demonstrate that they meet the minimum qualifications of a position, and then the most qualified applicant is selected (*Id.*).

ARDOT further maintains that Mr. Moore met the experience requirements and started working at ARDOT with many years of prior experience as a supervisor (Dkt. No. 36, ¶ 44). Although Mr. Hansberry purports to take issue with Mr. Moore's prior supervisory experience, Mr. Hansberry includes no record evidence to dispute it (*Id.*).

The parties do not dispute that Mr. Vines' recommendation to select Mr. Moore was approved by Mr. Vines' superiors, Assistant Chief Engineer Operations Mr. Sullivan at the Executive Level and Ms. Hunt on behalf of HR (*Id.*, ¶ 49). The parties agree that all individuals who were involved in the decision to select Mr. Moore have testified in their sworn affidavits that they took no action regarding Mr. Hansberry because of his race and acted in good faith at all times regarding Mr. Hansberry (*Id.*, ¶ 52).

It also is undisputed that two of the four candidates for AMS positions Mr. Vines recommended or approved the recommendation of since his promotion to District Engineer have been African American applicants, specifically Mr. Burnett on May 16, 2015, and Mr. Johnson on December 12, 2015 (*Id.*, ¶ 53). Mr. Hansberry asserts that this was done, at least in part, due to Mr. Hansberry's prior complaint of race discrimination in 2013 against Mr. Vines (*Id.*, ¶ 53). Mr. Hansberry does not bring a retaliation claim here, and the record evidence is that Mr. Vines recommended or approved the recommendation of African American applicants for open AMS positions both before and after the selection for the July 2015 AMS position that is the subject of Mr. Hansberry's race discrimination lawsuit.

For these reasons, viewing the record evidence in the light most favorable to Mr. Hansberry and drawing all reasonable inferences in favor of Mr. Hansberry, the Court finds that there is no

genuine issue of material fact with respect to Mr. Hansberry's failure to promote claim against ARDOT. ARDOT is entitled to summary judgment entered in its favor on this claim.

## 2. Demotion Claim

The Court will next address Mr. Hansberry's claim of racial discrimination based on his demotion in August 2015. To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 716 (8th Cir. 2012). Mr. Hansberry has shown the first three factors, as he is a member of a protected class, was qualified for his then-current job, and suffered an adverse employment action.

ARDOT argues that Mr. Hansberry has failed to show that similarly situated employees outside the protected class were treated differently. Mr. Hansberry asserts that three Caucasian employees were treated differently than he was treated with similar infractions at work. "[A] plaintiff can satisfy the fourth part of the *prima facie* case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker." *Pye v. Nu Aire, Inc.,* 641 F.3d 1011, 1019 (8th Cir. 2011) (citing *Lewis v. Heartland Inns of Am., L.L.C.,* 591 F.3d 1033, 1039–40 (8th Cir. 2010)). The Eighth Circuit has set a "'low threshold' for employees to be considered similarly situated" at the *prima facie* stage, "requiring only that the employees 'are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Orr v. City of Rogers*, 232 F. Supp. 3d 1052, 1063 (W.D. Ark. 2017) (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir.

2005)).  Based on this and the record evidence before it, the Court cannot say that Mr. Hansberry fails to meet the fourth element of his *prima facie* case as a matter of law.

In response to Mr. Hansberry's *prima facie* case for racial discrimination based on demotion, ARDOT has articulated a legitimate, nondiscriminatory reason to demote Mr. Hansberry.  *See Young v. Builders Steel Co.,* 754 F.3d 573, 577–78 (8th Cir. 2014).  At this stage then, "the presumption of discrimination disappears, and plaintiff is required to prove the proffered justification is merely pretext for discrimination."  *Id.* at 578.

ARDOT asserts that Mr. Hansberry was demoted in part because the decision makers believed that during an open crew meeting Mr. Hansberry described himself as a "murderer" or a "killer" and stated he either killed people or cut throats at night.  That Mr. Hansberry made these statements is not disputed, although Mr. Hansberry disputes the intent behind and context in which these statements were made.  Mr. Hansberry admits that in the crew meeting on July 27, 2015, he said, "I guess that I am a murderer, and I cut throats and kill people at night" or "I guess I'm a murderer and a cutthroat that kill people at night."  (Dkt. No. 36, ¶ 60).  Mr. Vines viewed these statements "as threatening, intimidating and creating reasonable fear of injury to another person or subjecting another individual to emotional distress" (*Id.*, ¶ 104).

ARDOT further asserts that the decision makers believed that Mr. Hansberry made statements indicating to his new supervisor that he would not be much help to him when asked whether Mr. Moore could count on him.  Mr. Vines viewed these statements as "derogatory remarks toward the Department and his supervisor" and, at a minimum, viewed all of Mr. Hansberry's alleged remarks as demonstrating an "inability to provide leadership which was a requirement of his position" (*Id.*).  Mr. Hansberry denied during ARDOT's investigation and

denies now that he made a statement to Mr. Moore indicating that he would not be much help to Mr. Moore (*Id.*, ¶ 64).

The proffered non-discriminatory reasons for termination need not be factually correct so long as the employer honestly believed the asserted grounds at the time of the termination. *See Hutson*, 63 F.3d at 781; *see also Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1127 (8th Cir. 2017) (finding that "a shortcoming in an internal investigation alone, without additional evidence of pretext, would not suffice to support an inference of discrimination on the part of the employer."); *Fatemi v. White*, 775 F.3d 1022, 1045 (8th Cir. 2015) (finding that plaintiff "provided no evidence that the defendants acted based on an intent to discriminate as opposed to a good-faith belief that [plaintiff] committed the [reported] offense"); *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004) (finding that defendant provided a legitimate, non-discriminatory basis for termination based on its belief that plaintiff was fighting, even if plaintiff could show that eye-witness accounts of the altercation were wrong).

Mr. Moore stated that he had a one-on-one conversation with Mr. Hansberry immediately following the July 27, 2015, crew meeting. Mr. Moore believed that Mr. Hansberry indicated to him during that conversation that he would not be much help to Mr. Moore. Mr. Moore acted on this belief by informing Mr. Halbert, who advised the remarks should be documented and addressed and who also was tasked with interviewing other crew members present (Dkt. No. 36, ¶¶ 71, 74); by informing Mr. Emberton, who was later tasked by Mr. Vines with conducting an investigation into the allegations and preparing a summary of the investigation (*Id.*, ¶ 91); and by sending an email to Mr. Vines about the one-on-one conversation in which Mr. Moore acknowledged that Mr. Hansberry denied making a statement that he would not help Mr. Moore (*Id.*, ¶¶ 73, 92-98). Mr. Vines stated that he received an email from Mr. Moore on the afternoon

of July 27, 2015, and a second one on July 28, 2015 (*Id.*, ¶ 100). Mr. Vines sent written materials generated by the investigation to HR and EEO for review and recommendation (*Id.*). Representatives from HR, Ms. Woods, and EEO, Ms. McFadden, agreed that ARDOT "should move to the next step in progressive discipline and demote [Mr.] Hansberry to a non-supervisory position" (*Id.*, ¶ 101). Mr. Vines then prepared a memorandum to his supervisor Mr. Sullivan regarding the matter (*Id.*, ¶¶ 103-04). In the memorandum, Mr. Vines also noted that Mr. Hansberry had been given a written warning for "multiple occasions of unauthorized usage of an ARDOT vehicle" (*Id.*, ¶ 105). In this memorandum, Mr. Vines recommended demotion (*Id.*, ¶¶ 105, 111).

Mr. Hansberry asserts that he went to Wynne, Arkansas, immediately following the crew meeting on July 27, 2015, and did not speak with Mr. Moore until later that day (Dkt. No. 30, Hansberry Depo., Ex. B, at 29-31). Mr. Hansberry also asserts that he spoke with Mr. Moore about the crew meeting; Mr. Hansberry maintains that he never told Mr. Moore that he would not be much help (*Id.*, at 33). Mr. Hansberry maintains that this is what he told Mr. Emberton and Mr. Vines when asked about this alleged conversation (*Id.*, at 32-33).

The record before the Court is not clear on the factual issue of what Mr. Hansberry said to Mr. Moore in their one-on-one conversation following the crew meeting. However, Mr. Hansberry has not shown that the alleged conversation with Mr. Moore, which he denies occurred, was used as pretext for his demotion. Mr. Vines asserts that he believed what Mr. Moore told him about the one-on-one conversation with Mr. Hansberry and relied on that nondiscriminatory belief, along with Mr. Hansberry's admitted statements about being a murder and slitting throats and the undisputed prior written warning Mr. Hansberry received for unauthorized usage of an ARDOT

vehicle, when recommending Mr. Hansberry's demotion (*Id.*, ¶¶ 105, 111). The Court finds that ARDOT has articulated a legitimate, non-discriminatory reason for Mr. Hansberry's demotion.

Mr. Hansberry also attempts to establish pretext through use of purported comparator evidence. This Court acknowledges that the standard in the Eighth Circuit Court of Appeals to determine whether employees are similarly situated at the pretext stage "is a search for a substantially similar employee, not for a clone." *Burton v. Arkansas Sec'y of State*, 737 F.3d 1219, 1231 (8th Cir. 2013) (quotations omitted). "To demonstrate that they are 'similarly situated,' he need only establish that [ ] he was treated differently than other employees whose violations were of *comparable seriousness.*" *Id.* (emphasis in original) (quotations omitted).

Even so, "[a]t the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.'" *Bone,* 686 F.3d at 956 (quoting *Rodgers,* 417 F.3d at 853). To succeed at this stage of the proceedings, Mr. Hansberry must show that he and the potential comparators he identifies were "similarly situated in all relevant respects." *Id.* (quoting *Rodgers*, 417 F.3d at 853). Thus, "[w]hat is relevant is [whether they] are involved in or accused of the same offense and are disciplined in different ways." *Id.* (quoting *Boner v. Bd. of Comm'rs*, 674 F.2d 693, 697 (8th Cir. 1982)). The employees used for comparison "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (quoting *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004)); *Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 606 (8th Cir. 1983); *see also Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."). Mr.

Hansberry asserts that Mr. Fleming, Mr. Moore, and Mr. Gray are potential comparators. For the following reasons, the Court disagrees based on the record evidence.

### a.     Larry Fleming

On August 2, 2011, Mr. Fleming was disciplined for his conduct in using a state vehicle for personal use and other inappropriate conduct, and ARDOT issued a Documentation of Performance Requiring Improvement to Mr. Fleming, placed him on leave without pay for two weeks, and required him to reimburse ARDOT for personal calls within the last 12 months (Dkt. No. 36, ¶ 126). Mr. Woodruff made the recommendation of discipline for Mr. Fleming and the final decision about the discipline (*Id.*, ¶ 127). Mr. Hansberry argues that Mr. Fleming committed acts of dishonesty and fraud but was not terminated or demoted. Mr. Hansberry also argues that Mr. Vines was involved in the disciplinary action against Mr. Fleming.

According to Mr. Woodruff's affidavit, even though Mr. Vines signed the Documentation of Performance Requiring Improvement as the Counseling Supervisor, he was not involved in the investigation into the allegations against Mr. Fleming (Dkt. No. 30, Woodruff Aff., Ex. C, ¶ 6). Instead, Mr. Woodruff maintains that he recommended the discipline for Mr. Fleming (*Id.*). Also, the Court determines that Mr. Fleming's personal use of a state vehicle is not comparable to the conduct in which Mr. Hansberry engaged when he made the admitted statements during the crew meeting and purportedly made statements later that he would not help his new supervisor. For these reasons, the Court finds that Mr. Hansberry's conduct is not similarly situated to Mr. Fleming's conduct and that Mr. Fleming is not a proper comparator at the pretext stage.

### b.     Don Moore

On December 9, 2015, Mr. Vines issued a written counseling to Mr. Moore for calling Mr. Sisk by the name of "Sambo." (*Id.*, ¶ 131). On January 27, 2016, Mr. Moore self-reported to his

supervisor that he had referred to an employee as "boy." (Dkt. No. 36, ¶ 136).[11]  According to the Documentation of Performance Requiring Improvement regarding this event, "[o]n that same date, the employee contacted EEO to express concerns that [Mr. Moore] had referred to him as 'boy'." (Dkt. No. 36, Ex. L).  On March 8, 2016, Mr. Vines placed Mr. Moore on five days leave without pay for using a word that had the potential of being viewed as a racial slur (Dkt. No. 36, ¶ 137).

Mr. Moore was disciplined for making inappropriate statements and was disciplined by the same supervisor as Mr. Hansberry.  However, based on the record before the Court, the conduct in which Mr. Moore engaged is not sufficiently comparable to the conduct in which Mr. Hansberry engaged for Mr. Moore to serve as a comparator at the pretext stage.  As an initial matter, there is no record evidence that, prior to these events, Mr. Moore received any sort of written warning, much less a written warning for multiple occasions of unauthorized usage of an ARDOT vehicle (*Id.*, ¶ 105).  ARDOT also maintains that the racial slurs made by Mr. Moore are not comparable to Mr. Hansberry's conduct.  The Court agrees to the extent that Mr. Hansberry admittedly made a statement that, even if said as a joke, could have been perceived as a threat during a group meeting and allegedly made a statement that Mr. Moore perceived as insubordinate during a one-on-one conversation.  Mr. Hansberry may disagree with the characterization that his admitted statement during the group meeting could have been perceived as a threat, but the Court cannot say based on the record evidence that such a characterization is beyond ARDOT's business judgment.  For these reasons, the Court finds that Mr. Moore is not a potential comparator for Mr. Hansberry.

---

[11]  It is undisputed that, at the time Mr. Vines selected Mr. Moore for the July 2015 AMS position, Mr. Vines was unaware of any racial comments or slurs that Mr. Moore had ever made (Dkt. No. 36, ¶ 47).

### c.     Robert Gray

On August 26, 2015, Mr. Gray was issued a Documentation of Performance Requiring Improvement for dictating assignment based on memory or convenience, which could be interpreted as discriminatory and lead to a potential hostile work environment (Dkt. No. 36, Ex. M).  Under the section for negative consequences, the form states that "[c]ontinued disregard for Department policy and procedure will result in further disciplinary action, up to and including termination."  (*Id.*).  Mr. Hansberry asserts that Mr. Vines was also involved in the disciplinary action against Mr. Gray, as evidenced by his signature on the documentation (*Id.*).

Even though Mr. Vines also signed Mr. Gray's documentation, the Court concludes that Mr. Gray's conduct leading to his discipline was not similar to Mr. Hansberry's conduct.  Mr. Gray was given a written warning for not having a standard plan as he assigned work to his crew.  There is no record evidence that Mr. Gray previously received a written warning for multiple occasions of unauthorized usage of an ARDOT vehicle (*Id.*, ¶ 105).  Further, Mr. Gray's conduct is not comparable to Mr. Hansberry's conduct.  Again, Mr. Hansberry admitted that he made a statement that, even if said as a joke, could have been perceived as a threat during a group meeting and allegedly made a statement that Mr. Moore perceived as insubordinate during a one-on-one conversation.  For these reasons, the Court finds that Mr. Gray is not sufficiently similarly situated to Mr. Hansberry for purposes of the pretext analysis.

For the above reasons, Mr. Hansberry has not shown that ARDOT's decision to demote him was pretextual by demonstrating that a similarly situated employee, who is not in Mr. Hansberry's protected class, was treated differently.  The Court finds that there is no genuine issue of material fact with regard to Mr. Hansberry's racial discrimination claim against ARDOT based on his demotion.

## C. Damages

The Court will next address the issue of damages. In his complaint, Mr. Hansberry requests back pay, front pay, and reinstatement rights. ARDOT asserts that, because Mr. Hansberry admitted that his health will not allow him to return to work, he is not entitled to back pay, font pay, or reinstatement. Mr. Hansberry did not address the issue of damages in his response to ARDOT's motion for summary judgment. Because the Court finds that ARDOT is entitled to entry of judgment as a matter of law, the Court will not grant Mr. Hansberry's request for back pay, front pay, and reinstatement rights and need not examine further this issue.

## IV. Conclusion

The Court grants summary judgment to ARDOT as to Mr. Hansberry's claim of racial discrimination based on failure to promote and demotion (Dkt. No. 30). The Court denies as moot ARDOT's motion *in limine* (Dkt. No. 46). Mr. Hansberry's complaint is hereby dismissed with prejudice (Dkt. No. 1).

It is so ordered, this 17th day of October, 2018.

Kristine G. Baker
United States District Judge